·GRINNELL (SEDGWICK v.). See Cases Nos. 12,612 and 12,613.

GRINNELL (SHAW v.). See Case No. 12,719.

## Case No. 5,832.

### GRISAR v. McDOWELL.

[4 Sawy. 597.] [1]

Circuit Court, N. D. California. July 17, 1866.[2]

MUNICIPAL LANDS — RESERVATION OF PUEBLO LANDS—TITLE TO PUEBLO LANDS.

1. Although a pueblo of some kind existed at the site of the present city of San Francisco, previous to and on the acquisition of the country, July 7, 1846, possessing some interest in lands within certain prescribed limits, yet the former government, until such acquisition, retained a right to control the use and disposition of these lands, until by action of the officers of the pueblo, or other competent authority, they became vested in private proprietorship, and that right upon the cession passed to the United States, and could at any time thereafter be exercised by reserving parcels of the lands for public purposes. Parties taking possession of any of the municipal lands thus reserved held them at the pleasure of the government.

[See note at end of case.]

2. Although an order of the president excepts and reserves from sale certain lands within the pueblo, using the language employed when a reservation of public lands is made, to which no adverse claim is asserted, yet the order is expressive of an intention to withdraw the lands from the control and disposition of the authorities of the pueblo, and will be enforced as effectual for that purpose.

[Cited in U. S. v. Hare, Case No. 15,303.]

[See note at end of case.]

3. The title of the pueblo to its municipal lands was an imperfect one, requiring further action of the government before it could be turned into an indefeasible estate. The claim of the city had, therefore, to undergo judicial investigation before the board of land commissioners, and to depend for its validity in extent upon the determination of the board and the tribunals of the United States to which it could be carried. The claim of the city, having been thus investigated, was confirmed to four square leagues, subject to certain exceptions, among which were all such parcels of land as had been previous to that time "reserved or dedicated to public uses by the United States." The lands thus reserved include Black Point, the premises in controversy in this case.

[See note at end of case.]

This was an action to recover the possession of certain real property, situated at or near the place known as Black Point, or Point San Jose, in the city of San Francisco. The plaintiff [Emil Grisar] claimed to be the owner in fee of the premises, deriving his title from the city of San Francisco by virtue of the ordinance of the common council for the settlement of land titles in the city, passed on the twentieth of June, 1855, commonly known as the "Van Ness Ordinance," and the act of the legislature of the state ratifying and confirming the same. The defendant [Irwin McDowell] is an officer in the army of the United States, commanding the department of the state of California, and as such officer, acting under the authority of the United States, entered upon and now holds possession of the premises as part of

1 [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

2 [Affirmed in 6 Wall. (73 U. S.) 363.]

the public property of the United States reserved for military purposes.

At the time the ordinance named was passed the city of San Francisco asserted title, as successor of a Mexican pueblo established and in existence on the acquisition of the country, to four square leagues of land, embracing the site of the present city, and had presented her claim for the same to the board of land commissioners created under the act of March 3, 1851 [9 Stat. 631], and the board had confirmed the claim to a portion of the land embracing the premises in question, and rejected her claim for the residue. Dissatisfied with the limitation of her claim, the city had prosecuted an appeal from the decision of the board to the United States district court, and this appeal was then pending and undetermined. By the second section of the ordinance the city relinquished and granted all the title and claim which she thus held to the land within her corporate limits, as defined by the charter of 1851, with certain exceptions, to the parties in the actual possession thereof, by themselves or tenants, on or before the first of January, 1855, provided such possession was continued up to the time of the introduction of the ordinance into the common council, or if interrupted by an intruder or trespasser, had been or might be recovered by legal process. In March, 1858, the legislature of the state ratified and confirmed this ordinance. The party through whom the plaintiff traced his title was in such actual possession of the premises in controversy, both at the time designated by the ordinance, and also on the passage of the confirmatory act of the legislature, and therefore acquired whatever right or title the city possessed; and he improved and cultivated the premises, and erected a building thereon, which was occupied by the plaintiff as his residence when he was removed by the defendant. On the other hand, the authorities of the United States, since 1850, claimed the right to hold the premises as lands set apart for public purposes. In November of that year President Fillmore ordered that they should be exempted and reserved from sale for such purposes; and in June of the following year notice of this order was communicated by the commissioner of the general land-office at Washington to the surveyor-general of the United States for California, and has ever since remained on file in his office. This order was afterward modified in some respects, and the land designated by means of a map with greater precision than was done in the first instance, but it was never revoked, although actual possession of the entire portion was not taken until it became necessary for the protection of our commerce to have the fortifications of the harbor increased. The question presented was, therefore, between the title of the city, as it existed on the first of January, 1855, and the title of the United States. The case was tried by the court upon stipulation of the parties without the intervention of a jury, at the June term, 1866.

B. S. Brooks and Geo. E. Whitney, for plaintiff.

Delos Lake, Dist. Atty., for defendant.

FIELD, Circuit Justice. It may be considered as settled that a pueblo of some kind existed at the site of the present city upon the acquisition of the country by the United States on the seventh of July, 1846; that the pueblo possessed some claim to or interest in lands to the extent of four square leagues, measured off from the northern portion of the peninsula upon which the city of San Francisco is situated; and that the city succeeded to the claim and interest of the pueblo.[3] This has been frequently held by the courts of the state and by this court.' And though the fact is not admitted in this case by the counsel of the government, it is not seriously controverted by them. We shall assume such to be the fact in the consideration of the case; it is upon the supposed existence of such fact that the pretension of the plaintiff rests.

It is difficult to state with precision the exact character of the title or interest which the pueblo possessed in its municipal lands. It is sufficient to say that the government undoubtedly retained a right to control the use and disposition of these lands, until by action of the officers of the pueblo, or other competent authority, they became vested in private proprietorship. Numerous grants to individuals within the limits of the four square leagues claimed were made by the governors of the department, some with and some without the sanction of, or even consultation with, the authorities of the pueblo. If they could thus pass the title to private persons, it would seem to be a reasonable inference that they could reserve from the disposition of those authorities such portions of the lands as might be required by the government for public purposes. And this is the conclusion expressed by this court in the opinion rendered when the pueblo case was decided. This power of control and disposition which existed with the former government passed upon the cession of the country, with all other public rights, to the United States, and could, at any time thereafter, be exercised in furtherance of their policy or the execution of their laws. Whoever took possession of any of the municipal lands over which the United States had thus

---

[3] The term "pueblo" answers to that of the English word "town," in all its vagueness and all its precision. As the word "town," in English, generally embraces every kind of population from the village to the city, and also, used specifically, signifies a town "corporate and politic," so the word "pueblo," in Spanish, ranges from the hamlet to the city; but used emphatically, signifies a town "corporate and politic."—Dwinelle's Colonial History of San Francisco, p. 7.

exercised their power, held such lands at the pleasure of the government. This view meets and overthrows the pretension of the plaintiff.

Though the order of the president exempts and reserves the lands from sale, using the language employed when a reservation is made of public lands to which no adverse claim is asserted, and which, but for such reservation, would be open for sale and settlement, yet it is as expressive of an intention to withdraw them from the control and disposition of the authorities of the pueblo as if it had in terms so declared.

There is another view of the title or interest of the pueblo to her municipal lands, which leads to the same conclusion. That title or interest, whatever it may have been, was an imperfect one; it was, in fact, only a restricted and qualified right to alienate portions of the lands in lots for building or cultivation, and to use the residue for commons, for pasture lands, or as a source of revenue or other public purposes; subject, however, in all particulars, to the control of the government of the country. Further action of that government was therefore necessary before absolute ownership could be affirmed in the pueblo. And since the change of jurisdiction, this imperfect right of the city—the successor of the pueblo—to her lands, required recognition and action of the new government before it could be turned into an indefeasible estate as known to our laws. The lands, too, had never been designated and measured off by the former government, and remained in this respect undefined upon the acquisition of the country. The claim of the city had therefore to undergo judicial investigation before the board of land commissioners, created under the act of March 3, 1851, and to depend for its validity and extent upon the determination of the board and of the tribunals of the United States to which it could be carried. The authorities of the city so regarded the claim, and by their direction it was presented to the board in July, 1852. In December, 1854, the board confirmed the claim, as we have already stated, to a portion of the four square leagues, and rejected it for the residue. From the decision, an appeal was taken by the filing of a transcript of the proceedings and decision of the board with the clerk of the district court. The appeal was by statute for the benefit of the party against whom the decision was rendered—in this case of both parties—of the United States, which contested the entire claim, and of the city, which asserted a claim to a greater quantity than that confirmed; and both parties gave notice of their intention to prosecute the appeal.

Subsequently, in February, 1857, the attorney-general withdrew the appeal on the part of the United States, and in March following, the district court, upon the stipulation of the district attorney, ordered that

appeal to be dismissed, and gave leave to the city to proceed upon the decree of the board as upon a final decree. This leave was not accepted, and the case remained until September, 1864, in the district court upon the appeal of the city. This appeal kept the whole issue open, the proceeding in the district court being in the nature of an original suit in which new evidence was admissible, and in which new positions could be assumed. U. S. v. Richie, 17 How. [58 U. S.] 534; San Francisco v. U. S. [Case No. 12,316], and Le Roy v. Wright [Id. 8,273]. On the first of July, 1864 [13 Stat. 332], congress passed the act "to expedite the settlement of titles to land in the state of California." By the fourth section of this act the district courts of California were authorized to transfer cases for the confirmation of claims to land under the act of March 3, 1851, pending before them on appeal to the circuit court of the United States, when they affected the title to lands within the corporate limits of any city or town. Under this act the district court, in September, 1864, transferred the pueblo case to the circuit court, and in October following, the circuit court confirmed the claim of the city to four square leagues, subject to certain exceptions, among which were all such parcels of land as had been, previous to that time, "reserved or dedicated to public uses by the United States." The lands thus reserved from the confirmation include the premises in controversy in this case. The right asserted by the plaintiff of course fell with the claim of the city, under which he held. The counsel of the plaintiff meets this conclusion by the fact that an appeal from the decision has been taken to the supreme court. This appeal he insists suspends the operation of the decree, and takes from it all efficacy as evidence of title. Such, undoubtedly, is the general effect of an appeal in these land cases; that is to say, the decrees rendered therein will not support the title of the confirmees or those claiming under them, pending appeals therefrom, when by the judgment of the appellate court the claim of the confirmee to the premises in controversy may be defeated. But such cannot be the effect of any judgment of the supreme court in the present case. That court can hear the case only upon the record, and can affirm or reverse or modify the decree only in those particulars in which error is alleged by the appellant. And the city has not appealed; she does not seek a reversal of the decree which excludes from confirmation to her the lands in controversy. The United States are the appellants, and a judgment rendered in their favor could only have the effect of defeating the entire claim of the city, or of restricting its extent in a still greater degree. We say the city has not appealed. She applied at the October term for an allowance of an appeal from so much of the decree as includes in the estimate of the quantity of

four square leagues confirmed, the parcels of land reserved or dedicated to public uses; in other words, she asked an appeal not to obtain a reversal of the decree in that it excluded the reserved lands from the confirmation, but in that the decree did not give to her four square leagues after excluding them. The allowance was, however, refused, and no action has since been taken by the city in the matter. It follows that the decree of the circuit court, as rendered, is conclusive upon the title of the plaintiff; it determines finally the validity of the reservation of the United States; it adjudges that the title has been in them since the conquest, or at least since the date of the reservation they claimed in 1850.

Judgment must therefore pass for the defendant.

[NOTE. The plaintiff having carried the case to the supreme court, the judgment of the circuit court was there affirmed in an opinion by Mr. Justice Field, who held that the authority of the president of the United States to make reservations of land is recognized in many acts of congress, and that from an early period in the history of the government it has been the practice of the president to order, from time to time, parcels of land belonging to the United States to be reserved from sale, and set apart for public uses. The purposes to be accomplished by the creation of pueblos did not require their possession of the fee. Their interest in the land was not an indefeasible estate. The interest amounted to little more than a restricted and qualified right to alienate portions of the land to its inhabitants for building or cultivation, and to use the remainder for commons, for pasture lands, or as a source of revenue, or for other public purposes. [The proceeding in the district court, though called in the statute an appeal, was not in fact such. It was essentially an original suit, and the dismissal of the appeal on the part of the United States did not, therefore, bind it to the terms of the original decree. In the execution of its treaty obligations with respect to property claimed under Mexican laws the government may adopt such modes of procedure as it may deem expedient. The act of congress of March 8, 1866 [14 Stat. 4], specifically settled all question of controversy in respect to the titles of the lands in question. 6 Wall. (73 U. S.) 363.]